*Adventist Healthcare, Inc. v. Steven S. Behram*, No. 16, September Term, 2023.

**CONTRACT INTERPRETATION – OBJECTIVE THEORY OF CONTRACT INTERPRETATION**

Maryland adheres to the objective theory of contract interpretation. Under that approach, unless the language of the contract is ambiguous, we interpret it based on what a reasonable person in the position of the parties would have understood the language to mean rather than the subjective intent of the parties at the time of formation. We do not interpret contractual language in a vacuum. Instead, we interpret that language in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution.

**CONTRACT INTERPRETATION – GENUINE DISPUTE OF MATERIAL FACT**

The parties, a hospital and a physician, entered a settlement agreement that, among other things, required the hospital to submit a report to a regulatory authority using specific language negotiated by the parties. In submitting its report, the hospital was required by the regulatory authority to select codes that generated text that appeared prominently in the report. The physician alleged that although the hospital could have selected codes that were consistent with the report it had agreed to submit, it instead chose codes that contradicted and were inconsistent with the report it had agreed to submit. In the physician's action for breach of the settlement agreement, the Circuit Court for Montgomery County awarded summary judgment to the hospital on the ground that the settlement agreement did not restrict the hospital's selection of codes in submitting its report. The Supreme Court, agreeing with the Appellate Court, held that, considering the text of the settlement agreement as well as its character and purpose and the facts and circumstances of the parties at the time of execution, a reasonable person in the position of the parties would have understood the hospital's obligation to report to the regulatory authority to preclude it from including additional language that contradicted and was materially inconsistent with the agreed language. Whether the code-generated language added by the hospital breached its obligation under the settlement agreement was a jury question.

**CONTRACT INTERPRETATION – RELEASE CLAUSES**

A physician's agreement to release all claims related to a suspension of his clinical privileges released his claim that the hospital failed to provide him a timely hearing to contest that suspension.

Circuit Court for Montgomery County
Case No. 483870V
Argued: April 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 16

September Term, 2023

_____

ADVENTIST HEALTHCARE, INC.

v.

STEVEN S. BEHRAM

_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.
Gould, J., joins in judgment only.

_____

Filed: August 27, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In this appeal, we explore when it is appropriate to grant summary judgment in a breach of contract action. Adventist Healthcare, Inc., doing business as Shady Grove Medical Center (the "Hospital"), and Dr. Steven S. Behram entered into a Confidential Agreement, Release and Waiver (the "Settlement Agreement" or "Agreement") to resolve a dispute about the Hospital's suspension of Dr. Behram's clinical privileges.[1] The parties agreed, among other things, that the Hospital would reinstate Dr. Behram's clinical privileges in full, and Dr. Behram would then promptly resign those privileges. The parties also agreed to specific language the Hospital would use in subsequently reporting Dr. Behram's suspension and reinstatement to regulatory authorities. Dr. Behram contends that the Hospital breached the Agreement when it filed reports that, in addition to the agreed language, included language that contradicted and was inconsistent with the agreed language. The additional language was generated by alphanumeric codes the Hospital selected when it filed the reports.

The Circuit Court for Montgomery County granted summary judgment in favor of the Hospital on the ground that the Settlement Agreement did not obligate the Hospital to use particular codes when making its report. The Appellate Court of Maryland disagreed, *Behram v. Adventist Health Care, Inc.*, No. 375, Sept. Term, 2022, 2023 WL 4011686, at *16, *24 (Md. App. Ct. June 15, 2023), as do we. We hold that a reasonable person in the

---

[1] Before us, the Hospital is the petitioner and cross-respondent, and Dr. Behram is the respondent and cross-petitioner. In the circuit court, Dr. Behram was the plaintiff and the Hospital the defendant.

2

position of the parties would have understood that the Hospital's obligation to report to regulatory authorities using specific, agreed upon language precluded the Hospital from also reporting contradictory and materially inconsistent language in the same report, regardless of how that language was generated. On this record, whether the additional language added by the Hospital materially breached that obligation is a jury question.

Dr. Behram also contends that the Hospital breached its medical staff bylaws when it failed to provide him with a timely hearing after it suspended him. The circuit court awarded the Hospital summary judgment on that claim, concluding that Dr. Behram had released that claim in the Settlement Agreement. The Appellate Court agreed with the circuit court, *id.* at *16, *24, as do we.

Accordingly, we affirm in full the judgment of the Appellate Court.

## BACKGROUND

### A. *Factual Background*

The background to this contractual dispute lies in a lengthier dispute, which the parties intended the Settlement Agreement to resolve. Dr. Behram is an obstetrician who previously had clinical privileges to practice at the Hospital. He also had professional relationships with other Hospital-affiliated doctors, including some in leadership, that were not harmonious.

In 2019, the Hospital's Medical Executive Committee twice voted to suspend Dr. Behram. The Hospital contends that the suspensions arose from concerns about Dr. Behram's patient care. Dr. Behram alleges that the Hospital never had real concerns

3

about his patient care. Instead, he claims that Hospital and medical staff leadership suspended him for anticompetitive reasons and out of personal animus.[2] The resolution of that dispute is irrelevant to the issues now before us because the parties subsequently entered into the Settlement Agreement, in which each party agreed to undertake certain actions and to release certain claims. Our review of the factual background is limited to those facts necessary to provide context for the parties' undertakings in the Settlement Agreement.

### 1. Suspension, Reinstatement, and Fair Hearing Disputes

On both occasions that the Hospital's Medical Executive Committee voted to suspend Dr. Behram, the letters notifying Dr. Behram cited "significant concerns about the quality of [his] care of patients at [the] Hospital, which [were] deemed to represent an immediate risk of harm or an immediate or imminent risk of danger to patients." In each letter, the Hospital identified a single case in which Dr. Behram was alleged to have provided deficient patient care. Dr. Behram disputes the allegations in both letters as well as the Hospital's good faith in making them.[3]

---

[2] Dr. Behram's complaint details his version of the history of his disputes with specific individuals and his claims concerning the efforts of those individuals to undermine him and his practice and to "weaponize" the Hospital's peer review process against him. The particulars of those individual disputes are irrelevant to our analysis, and so we will not address them in any detail.

[3] With respect to the first suspension, the Hospital alleged that Dr. Behram had failed to address a patient's hypotension and subsequent sepsis, requiring the patient to undergo an emergency hysterectomy. Dr. Behram claims that a simple review of patient records would have revealed that the patient's infection occurred after Dr. Behram's role in the

4

The first suspension occurred in July 2019.  Less than 30 days later, the Medical Executive Committee reinstated Dr. Behram's privileges.  The second suspension occurred in September 2019.  That time, the Medical Executive Committee voted to continue the second suspension, which resulted in it extending longer than 30 days.[4]

The duration of the suspensions is significant because federal law requires a health care entity to report to the National Practitioner Data Bank ("Data Bank")[5] whenever the

patient's care had ended.  With respect to the second suspension, the Hospital alleged that Dr. Behram had delayed an emergency caesarian section by attempting an alternative medical procedure, resulting in a poor fetal outcome.  Dr. Behram contends that he attempted the alternative procedure only because the Hospital did not have an available operating room or anesthesiologist to support the caesarian section.

[4] At the time the Medical Executive Committee voted to extend the second suspension beyond 30 days, it also referred Dr. Behram to the Maryland Physician Health Program, which is an organization that helps health care professionals "address issues that may potentially impact their ability to practice medicine," including alcohol and substance abuse, mental or emotional health, physical and cognitive impairment, and behavioral issues.  *Maryland Physician Health Program*, Center for a Healthy Maryland, https://healthymaryland.org/maryland-physician-health-program/ (last accessed June 11, 2024), *archived at* https://perma.cc/SD6U-Z9BY.  After examining Dr. Behram, the program concluded there was "no evidence of any potential underlying conditions that could impact [Dr. Behram's] ability to practice medicine in a safe, competent, and professional manner."  Dr. Behram alleges that the Hospital referred him to the Maryland Physician Health Program as part of its effort to "create a false and misleading narrative to further defame him."

[5] The Data Bank is a database operated by the United States Department of Health and Human Services.  *About Us*, National Practitioner Data Bank, https://www.npdb.hrsa.gov/topNavigation/aboutUs.jsp (last accessed June 11, 2024), *archived at* https://perma.cc/8T4J-9HMX.  It contains information on malpractice and other adverse actions against healthcare providers and is visible to eligible entities including, but not limited to, state licensing boards and hospitals.  *Id.*; *NPDB Reporting Requirements and Query Access*, National Practitioner Data Bank, https://www.npdb.hrsa.gov/resources/tables/reportingQueryAccess.jsp (last accessed June 11, 2024), *archived at* https://perma.cc/L33S-TG6U.

entity takes a "professional review action that adversely affects the clinical privileges of a physician" that lasts "longer than 30 days." 42 U.S.C. §§ 11133, 11134; 45 C.F.R. § 60.12(a)(1)(i). Because the first suspension was shorter than 30 days, the Hospital was not required to report it to the Data Bank. Although under a legal obligation to report the second suspension once it was in effect for more than 30 days, 42 U.S.C. § 11133(a)(1)(A); 45 C.F.R. § 60.12(a)(1)(i), the Hospital failed to do so, *see* 45 C.F.R. § 60.5 (requiring reporting "within 30 days following the action to be reported"). The record contains no explanation for that failure, which plays prominently in the parties' dispute about the Hospital's eventual report nearly a year later.

Under the Hospital's Medical Staff Bylaws (the "bylaws"), a physician whose medical staff privileges have been "restricted[] or otherwise adversely affected" so as to trigger the requirement to report to the Data Bank is entitled to a "fair hearing" before a neutral panel to challenge that action. On November 7, 2019, Dr. Behram made a timely request for a fair hearing to contest his second suspension. The bylaws required the Hospital to hold the fair hearing within 60 days after it was requested, or, here, by January 6, 2020. However, the Hospital failed to schedule a fair hearing until August 2020, when it scheduled the hearing for the following month. The record does not contain any explanation for that delay.[6]

---

[6] Although the bylaws permit the President of the Medical Staff to postpone a fair hearing for good cause, no postponement was requested or provided in this case. In March 2020, in response to a follow-up request by Dr. Behram, the Hospital contended that it

### *2. The Settlement Agreement*

Before the fair hearing was scheduled to occur, the parties agreed to the terms of the Settlement Agreement. The Agreement begins with a set of recitals identifying the parties' agreement to resolve their dispute on certain terms without providing Dr. Behram with the fair hearing to which he was entitled:

> **WHEREAS**, the Physician's privileges were summarily suspended on September 26, 2019; and
>
> **WHEREAS**, the Physician is entitled to a fair hearing under the Medical Staff Bylaws; and
>
> **WHEREAS**, the Medical Staff's Executive Committee has agreed to resolve the matter by voting to reinstate the Physician before the Physician exercised his rights to a fair hearing under the Medical Staff Bylaws; and
>
> **WHEREAS**, the Physician has determined to continue his medical practice elsewhere and wishes to resign his clinical privileges and Medical Staff membership at the Hospital.

Following the recitals, Section 1 identifies the effective date of the Agreement as the date of "full execution by the Parties." Section 2 then identifies the following undertakings relevant to this dispute:

> **2. Undertakings by the Parties.** In consideration of the release and waiver set forth in Section 3 herein and the undertakings contained in this Agreement, the Parties agree to the following:
>
>> **a. Reinstatement of Privileges.** Upon execution of this Agreement by both parties, the Medical Executive Committee will

---

could not schedule the fair hearing at that time due to restrictions arising from the COVID-19 pandemic. The Hospital did not provide a reason for its failure to schedule the fair hearing between January 6, 2020 and the onset of the COVID-19 pandemic in March 2020.

7

convene to reinstate Physician's clinical privileges at the Hospital. . . .

**b. Resignation Letter.** Immediately after the Physician's clinical privileges are reinstated by action of the Medical Executive Committee, the Physician will be deemed to have submitted the letter, attached to this Agreement as Exhibit 1, to resign from his Medical Staff membership and clinical privileges at the Hospital.

\* \* \*

**e. NPDB Entry.** The Hospital will submit the report attached hereto as Exhibit 3, to the National Practitioner Data Bank by no later than 15 days after the Effective Date of this Agreement. The Hospital will provide this same language to the Maryland Board of Physicians at the same time.[7]

The Settlement Agreement includes an integration clause, which states that the "Agreement constitutes the full and complete understanding between the Parties, and except as provided herein, revokes, cancels and supersedes any prior understanding or agreement, whether oral or in writing, between them." The parties also agreed that any subsequent agreements had to be "in writing and signed by each of the Parties" and that Dr. Behram "is not relying on any representation by or on behalf of the Hospital, except as expressly set forth in this Agreement." The Agreement also contains a mutual disclaimer of any admission of liability and releases by both parties. Dr. Behram released the Hospital broadly from all claims "that relate[] to the Hospital's July 17, 2019 suspension and subsequent reinstatement of the Physician's privileges on August 13, 2019, and, the

---

[7] Sections 2.c. and 2.d. address, respectively, the Hospital's agreements to provide certain language in letters of reference for Dr. Behram and to direct telephone calls seeking references to a particular individual at the Hospital.

8

Hospital's suspension of the Physician's privileges on September 26, 2019." In turn, the Hospital released Dr. Behram from all claims that relate to those same events "and any disclosed or undisclosed allegations relating to patient care . . . ."

The Settlement Agreement includes two exhibits that are of particular relevance to the issues before us. First, Exhibit 1, referred to in Section 2.b. of the Settlement Agreement (quoted above), contains the following text:

**EXHIBIT 1**
**[ON STEVE BEHRAM'S LETTERHEAD]**
**[DATE—ONE DAY AFTER REINSTATEMENT VOTE BY MEC][8]**

> Shelia Myers
> Director, Medical Staff Services
> Shady Grove Medical Center
> 9901 Medical Center Drive
> Rockville, MD 20850
>
> Dear Ms. Myers:
>
> By this letter, I submit my resignation from the Hospital's Medical Staff, including both my membership on the Medical Staff and my clinical privileges at the Hospital, effective immediately.
>
> Very truly yours,
>
> Steve Behram, M.D.

Second, Exhibit 3, referred to in Section 2.e. of the Settlement Agreement (quoted above), contains the following text:

**EXHIBIT 3**
**[REPORT TO NPDB AND MBP][9]**

---

[8] The "MEC" is the Medical Executive Committee.

[9] The "NPDB" is the Data Bank and the "MBP" is the Maryland Board of Physicians.

Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reappointment and reinstate his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital.

### 3. Pre-Execution Actions

Sections 1 and 2 of the Settlement Agreement contemplate the following order of undertakings: (1) the parties would execute the Agreement; (2) the Medical Executive Committee would "convene to reinstate" Dr. Behram's clinical privileges; (3) Dr. Behram would resign his reinstated clinical privileges; and (4) the Hospital would report to the Data Bank "by no later than 15 days after the Effective Date of this Agreement."[10] For reasons that are not disclosed in the record, undertakings (2) through (4) all occurred before undertaking (1). According to the signatures on the Settlement Agreement, Dr. Behram executed it on September 16, 2020 and the Hospital executed it on September 21, 2020, making the latter the Agreement's effective date. The Medical Executive Committee, however, voted to reinstate Dr. Behram's privileges a full week earlier, on September 14, 2020. One day later, Dr. Behram, apparently following the requirements of the agreed-to-

---

[10] Section 2.e. of the Agreement provides only a "no-later-than" date for reporting to the Data Bank, with no "not-before" date. But the content of Exhibit 3 speaks in the past tense about both the Medical Executive Committee's vote and Dr. Behram's resignation, demonstrating an intent that the report post-date both of those events.

but-not-yet-executed Settlement Agreement, submitted his letter of resignation.[11]  The

Hospital then submitted its first report to the Data Bank on September 17, 2020.

### 4.  *Post-Settlement Reports to the Data Bank*

Under 42 U.S.C. § 11133, health care entities, including the Hospital, are required

to report to the Data Bank when the entity "takes a professional review action that adversely

affects the clinical privileges of a physician for a period longer than 30 days[.]"  42 U.S.C.

§ 11133(a)(1)(A); 45 C.F.R. § 60.12(a)(1)(i).  Health care entities are also required to

report when they accept a surrender of clinical privileges by a physician who is under

investigation or in return for not conducting an investigation.  42 U.S.C. § 11133(a)(1)(B).

The health care entity is required to report the name of the physician or practitioner, a

description of the acts or omissions or other reasons for the action, or, if known, for the

surrender, and other information surrounding the circumstances of the action or surrender

---

[11] The provisions in the body of the Settlement Agreement contain multiple apparent inconsistencies with the exhibits to the Agreement, especially with respect to the timing of completing the parties' respective undertakings.  For example, Section 2.a. provides that the Medical Executive Committee would vote to reinstate Dr. Behram's privileges only "upon execution of this Agreement by both parties," which did not occur until September 21, 2020.  Exhibit 3, however, requires the Hospital to report that the Medical Executive Committee voted to reinstate his privileges on September 14, 2020, a full week earlier.  Similarly, Section 2.b. of the Agreement and Exhibit 1 are inconsistent in their treatment of both the timing and mechanism for Dr. Behram's resignation.  Section 2.b. provides that the letter attached as Exhibit 1 "will be deemed to have [been] submitted," without any action by Dr. Behram, "[i]mmediately after the Physician's clinical privileges are reinstated[.]"  Exhibit 1 itself, however, contemplates that the text of the letter would be placed    on    Dr. Behram's    letterhead    and    submitted    "ONE    DAY    AFTER REINSTATEMENT VOTE BY [the Medical Executive Committee]."  In submitting his resignation letter on September 15, 2020, Dr. Behram appears to have been following the requirements of Exhibit 1.

11

as appropriate. *Id.* § 11133(a)(3). Reports filed with the Data Bank are visible to eligible entities including, but not limited to, state licensing boards and hospitals. *About Us*, National Practitioner Data Bank, *supra* note 4. A health care entity that fails to comply with the reporting requirements risks losing the protection of 42 U.S.C. § 11111(a)(1), which limits damages available for professional review actions. 42 U.S.C. § 11133(c)(1).

As noted, for reasons not disclosed in the record, the Hospital failed to report Dr. Behram's second suspension when it was required to do so in the Fall of 2019. Instead, the Hospital did so on September 17, 2020, four days before the effective date of the Agreement, in the same report in which it reported Dr. Behram's surrender of his clinical privileges. The way in which the Hospital reported Dr. Behram's suspension is critical to our resolution of this appeal, so we will review it in some detail.

In the Settlement Agreement, the parties agreed on precise language to be reported to the Data Bank:

> Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reappointment and reinstate his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital.

(the "Agreed Report Language"). The Hospital ended up submitting four different reports to the Data Bank, three of which are appended in full at the end of this opinion. Each report is between two and two-and-a-half pages long, most of which is populated with identifying information about Dr. Behram (i.e., name, gender, date of birth, address, provider

12

identifier, educational information, specialty, etc.) and fields to identify information such as the status of the report and whether it was contested.

Information about the action being reported is contained in two areas of the report. First, near the top of the first page, there is a two-column section identifying the action being reported and the basis for the initial action. The information contained in those columns, which appears in all capital letters and in a larger font than all following sections, is generated by codes selected and input by the reporting health care entity. Although generated by the selection of codes, what appears in the reports is text. As an example, the top half of the first page of the Hospital's first report concerning Dr. Behram is:



| NATIONAL PRACTITIONER DATA BANK | DCN: 5500000165725358 |
| **NPDB** | Process Date: 09/17/2020 |
| P.O. Box 10832 | Page: 1 of 3 |
| Chantilly, VA 20153-0832 | BEHRAM, STEVE S |
| | For authorized use by: |
| https://www.npdb.hrsa.gov | BEHRAM, STEVE S |

## BEHRAM, STEVE S

### SHADY GROVE MEDICAL CENTER

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 09/26/2019 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES<br>- VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - IMMEDIATE THREAT TO HEALTH OR SAFETY<br>- SUBSTANDARD OR INADEQUATE CARE |

| A. REPORTING ENTITY | | |
|---|---|---|
| | Entity Name: | SHADY GROVE MEDICAL CENTER |
| | Address: | 9901 MEDICAL CENTER DR |
| | City, State, Zip: | ROCKVILLE, MD 20850-3357 |
| | Country: | |
| | Name or Office: | SHELIA MYERS |
| | Title or Department: | DIRECTOR, MEDICAL STAFF SERVICES |
| | Telephone: | (240) 826-6116 |
| | Entity Internal Report Reference: | |
| | Type of Report: | INITIAL |

13

Second, Section C of the reports, labeled "Information Reported," contains several fields to identify the type of action taken, the basis for the action, classification codes applying to the action, the dates on which the action was taken and became effective, the length of the action, and a field for inputting a narrative description. The language identifying the basis for the action is identical to the code-generated text near the top of the first page, including being written in all capital letters (though in a font more consistent with other text on the page), with the addition of parentheticals following each statement that identify the codes used to generate the language. As an example, the entirety of Section C as contained on page two of the Hospital's first report concerning Dr. Behram is:

| C. INFORMATION REPORTED | | |
|---|---|---|
| | Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| | Basis for Action: | IMMEDIATE THREAT TO HEALTH OR SAFETY (F1) |
| | | SUBSTANDARD OR INADEQUATE CARE (F6) |
| | Adverse Action Classification Code(s): | SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES (1632) |
| | | VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) |
| | Date Action Was Taken: | 09/26/2019 |
| | Date Action Became Effective: | 09/26/2019 |
| | Length of Action: | PERMANENT |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken | by Reporting Entity: | Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reinstatement of his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital. The Professional Affairs Sub-Committee of the Board approved the reinstatement and resignation on September 30, 2020 with a retroactive date of September 16, 2020. |

### i.     *The First Report*

As reflected in the images above, in submitting its first report, the Hospital submitted more than the Agreed Report Language in two ways. First, the codes the Hospital selected from the menu provided by the Data Bank populated the report with the

14

following additional language, both at the top of the first page of the report and again at the beginning of Section C:

SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES

VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT

IMMEDIATE THREAT TO HEALTH OR SAFETY

SUBSTANDARD OR INADEQUATE CARE

The second and third code-generated statements listed above are at the core of the parties' present dispute. We will refer to them respectively as the "Voluntary Surrender Code-Generated Statement" and the "Immediate Threat Code-Generated Statement."

Second, in the narrative field in Section C, the Hospital added the following additional sentence that was not contained on Exhibit 3: "The Professional Affairs Sub-Committee of the Board approved the reinstatement and resignation on September 30, 2020 with a retroactive date of September 16, 2020."

### ii.    The Second Report

After the Hospital submitted the first report, Dr. Behram asserted that the Hospital had breached the Settlement Agreement by adding the Voluntary Surrender Code-Generated Statement and the extra sentence in the narrative portion of Section C.[12] In partial response to Dr. Behram's complaint, nearly a month after it had submitted the first

---

[12] Dr. Behram did not initially complain about the Immediate Threat Code-Generated Statement.

report, the Hospital submitted a second report that omitted the extra sentence from the narrative but maintained all of the original code-generated statements.

### iii. The Third and Fourth Reports

Dr. Behram continued to assert that the Voluntary Surrender Code-Generated Statement was knowingly false and defamatory, and that its inclusion violated the Settlement Agreement. In email correspondence between counsel, the Hospital at first insisted that it did not have any choice but to use the codes it had selected because alternate codes suggested by Dr. Behram were not available. Dr. Behram's counsel responded that the alternate codes were not available only because the Hospital had chosen to combine what should have been reported as two separate events—the suspension and reinstatement of privileges—into a single report, to hide the fact that it had failed to timely report the suspension a year earlier. Dr. Behram's counsel stated that "[i]n order to comply with the settlement agreement, there need[s] to be two reports – [an initial Adverse Action Report] reflecting the suspension, and a subsequent [Revision to Action report] reflecting the reinstatement of his privileges."

In response to Dr. Behram's complaints, the Hospital filed its third and fourth reports on consecutive days in November 2020. The third report, which is identified as reporting on an "Initial Action," identifies the action taken as a "SUSPENSION OF CLINICAL PRIVILEGES" on September 26, 2019, and the basis for the action as "SUBSTANDARD OR INADEQUATE CARE." Those are the only two code-generated

16

statements in the third report, which includes the Agreed Report Language (and only that language) in the narrative field.

The fourth report, which is identified as reporting on a "Subsequent Action" to the suspension reported the day before, identifies the action taken as "CLINICAL PRIVILEGES RESTORED OR REINSTATED, COMPLETE," taken on September 14, 2020, and continues to identify the basis for the initial action as "SUBSTANDARD OR INADEQUATE CARE." Those are the only two code-generated statements in the fourth report, which again includes only the Agreed Report Language in the narrative field. The only mention of Dr. Behram's resignation of his privileges in both the third and fourth reports is in the Agreed Report Language. Neither of those reports contains any reference to an immediate threat to health or safety or a voluntary surrender of privileges to avoid investigation.

Dr. Behram alleges that at least four entities with whom he had or would want to have business relationships obtained, or were provided with, the Hospital's knowingly false reporting in the first and second reports during the approximately two months they were available.

### B. *Procedural Background*

The operative complaint, Dr. Behram's third amended complaint, contains four counts, two of which are relevant to this appeal.[13] In Count One, Dr. Behram contends that

---

[13] Count Two of Dr. Behram's initial complaint was for injurious falsehood. Dr. Behram subsequently abandoned that claim but did not renumber the other counts in

the Hospital breached the Settlement Agreement by filing the first and second reports. Specifically, Dr. Behram contends that the Hospital's inclusion of the Voluntary Surrender and Immediate Threat Code-Generated Statements in the first and second reports breached the Hospital's obligations concerning reporting to the Data Bank. In Count Four, Dr. Behram alleges that the Hospital breached its bylaws by failing to provide him with a timely fair hearing.

The Hospital moved to dismiss or, in the alternative, for summary judgment. As relevant here, the motions court granted summary judgment in favor of the Hospital on Count One on the ground "that there's no contractual obligation on the part of [the Hospital] to utilize any particular code for reporting the incident." As a result, the court reasoned, the Hospital's selection of codes could not have violated any obligation it owed under the Settlement Agreement. With respect to Count Four, the court granted the Hospital's motion to dismiss—and, in the alternative, its motion for summary judgment— on the ground that Dr. Behram had released that claim in the Settlement Agreement.

The Appellate Court affirmed in part and vacated in part. *Behram*, 2023 WL 4011686, at *16, 25. In a well-reasoned decision, the Appellate Court held that the motions court erred in granting summary judgment on Count One. *Id.* at *16-20. The Appellate

the third amended complaint. Count Three of the third amended complaint is for defamation. The Appellate Court vacated the circuit court's award of judgment in favor of the Hospital on that count, *Behram v. Adventist Health Care, Inc.*, No. 375, Sept. Term, 2022, 2023 WL 4011686, at *22, *24 (Md. App. Ct. June 15, 2023), and the Hospital has not contested that ruling in this Court.

Court concluded that when viewing the text, character, and purpose of the Agreement in light of the facts and circumstances surrounding its execution, "a reasonable person in the position of [the Hospital] could understand the obligation to 'submit the report' set forth in Exhibit 3 to prohibit [the Hospital] from filing reports with language that materially deviates from that negotiated provision." *Id.* at *19. The Appellate Court also stated: "To the extent that there is any ambiguity about the meaning and scope of this reporting restriction, Dr. Behram and his attorney" had submitted affidavits containing information about the purpose of negotiating limits on what the Hospital would report to the Data Bank.[14] *Id.* Ultimately, the Appellate Court held that the circuit court erred in granting summary judgment in favor of the Hospital because Dr. Behram presented sufficient facts and evidence to establish a material dispute over whether the Hospital "breached its reporting obligation by acting in bad faith when it submitted the first two [Data Bank]

---

[14] The Appellate Court further explained that it read the Agreement "in light of the covenant of good faith and fair dealing under which each party must do nothing to destroy the rights of the other party to enjoy the fruits of the contract and [] do everything that the contract presupposes they will do to accomplish its purpose." *Behram*, 2023 WL 4011686, at *19 (alteration in original) (internal quotation marks omitted) (quoting *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 281 (2009)). The Appellate Court concluded that the circuit court erred in focusing solely on the absence of an express agreement about which codes would be used in the Hospital's report to the Data Bank because "a reasonable person could understand [the Hospital's] duty to 'submit the report attached . . . as Exhibit 3' to encompass a corollary obligation to act in good faith by not adding language that undermines the negotiated description of the nature and reasons for Dr. Behram's September 2019 suspension and September 2020 resignation." *Id.* at *20 (omission in original). As explained below, our resolution of this appeal does not depend on the implied duty of good faith and fair dealing, which neither party raised in the circuit court and which the circuit court did not address.

reports with different and disparaging language about its suspension of his clinical privileges and his subsequent 'voluntary surrender' of them." *Id.* at *20.

As to the breach of the bylaws claim, the Appellate Court held that the motions court correctly granted summary judgment because Dr. Behram released that claim in the Settlement Agreement. *Id.* at *24.

We granted certiorari to address whether the Appellate Court correctly interpreted the Settlement Agreement concerning both the Hospital's reports to the Data Bank and the release of Dr. Behram's claim that the Hospital breached its bylaws. *Adventist Healthcare, Inc. v. Behram*, 486 Md. 95 (2023).

## DISCUSSION

### I. STANDARD OF REVIEW

The circuit court granted the Hospital's motion to dismiss Dr. Behram's claim for breach of the bylaws (Count Four) and granted summary judgment in favor of the Hospital on that claim (in the alternative) and on Dr. Behram's claim for breach of the Settlement Agreement (Count One). We review the grant or denial of a motion to dismiss to determine "whether the trial court was legally correct" after accepting "all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 284 (2018) (first citing *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643-44 (2010); then quoting *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 475 (2004)). We limit

20

our analysis to the "four corners of the complaint[.]" *Id.* (quoting *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 497 (2014)).

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2-501(a). A fact is material if it "will somehow affect the outcome of the case." *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 533 (2021) (quoting *Taylor v. NationsBank, N.A.*, 365 Md. 166, 173 (2001)). This Court reviews a circuit court's grant of summary judgment without deference. *Bd. of County Comm'rs of St. Mary's County v. Aiken*, 483 Md. 590, 616 (2023). In doing so, we come to an independent determination of whether, reviewing the record in the light most favorable to the non-moving party and construing all reasonable inferences against the moving party, a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Id.*; *Gambrill v. Bd. of Educ. of Dorchester County*, 481 Md. 274, 297 (2022). Our role in that undertaking is the same as the circuit court's, which is not to resolve factual disputes but merely to determine whether those disputes "exist and are sufficiently material to be tried." *Gambrill*, 481 Md. at 297.

The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law reviewed without deference. *Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7 (2014).

## II.      PRINCIPLES OF CONTRACT INTERPRETATION

Maryland courts follow the objective theory of contract interpretation.[15]  *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 482 Md. 223, 239 (2022).  "Under that approach, unless the language of the contract is ambiguous, we interpret it 'based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation."  *Id.* (quoting *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (internal quotation marks omitted)); *see also JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635 (1997) ("The test is what meaning a reasonably prudent layperson would attach to the term." (quoting *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 521-22 (1997))).  Therefore, it is "the written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract."  *Tapestry*, 482 Md. at 239 (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015)).

We do not, however, interpret contractual language in a vacuum.  Instead, we interpret that language "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution."  *Credible Behav. Health*, 466 Md. at 394 (internal quotation marks

---

[15] Settlement agreements are enforceable contracts subject to the same interpretive rules as other contracts.  *See O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 421 (2016) ("[W]e apply the rules of construction of contracts in interpreting a settlement agreement." (citing *Clark v. Elza*, 286 Md. 208, 219 (1979))).

omitted) (quoting *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 88 (2010)). Although providing relevant context may necessarily require consultation of evidence beyond the "four corners" of the contract itself,[16] it does not extend to extrinsic or parol evidence of the parties' subjective intent, such as evidence of the parties' negotiations. *Impac Mortg. Holdings, Inc.*, 474 Md. at 534 n.32. Such evidence may be considered only after a court first determines that the relevant contract language is ambiguous, which occurs when, viewing the plain language in its full context, "a reasonably prudent person could ascribe more than one reasonable meaning to it." *Credible Behav. Health*, 466 Md. at 394.

In interpreting the plain language of a contract in context, we attempt to construe the contract as a whole, interpreting "separate provisions harmoniously, so that, if possible, all of them may be given effect." *Id.* at 396 (quoting *Walker v. Dep't of Human Res.*, 379 Md. 407, 421 (2004)). Construing the contract as a whole requires that effect "'be given to each clause' to avoid 'an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'" *Id.* at 397 (quoting *Clancy v. King*, 405 Md. 541, 557 (2008)).

---

[16] This Court has, in the past, sometimes stated that in the absence of ambiguity, its review of contracts is limited to the four corners of the agreement. *See Lithko Contracting, LLC v. XL Insurance America, Inc.*, ___ Md. ___, No. 31, Sept. Term, 2023, 2024 WL 3407452, at *5 n.9 (2024). As we noted earlier this term, "[i]n context, those statements were addressed to extrinsic evidence of the parties' subjective intent, such as documentation of their course of dealings in negotiating the contract at issue or other agreements, not to information about the context in which the contract at issue was entered." *Id.*

It is a "bedrock principle of contract interpretation" in Maryland that our courts "consistently 'strive to interpret contracts in accordance with common sense.'" *Id.* (quoting *Brethren Mut. Ins. Co. v. Buckley*, 437 Md. 332, 348 (2014)).

## III.   COUNT ONE:  BREACH OF THE AGREEMENT

### A.   *The Appellate Court Did Not Improperly Consider Parol Evidence of the Parties' Subjective Intent in Determining Whether the Settlement Agreement Is Ambiguous.*

We must confront a preliminary issue before we can turn fully to assessing whether the circuit court erred in awarding summary judgment to the Hospital on Dr. Behram's claim that the Hospital breached the Settlement Agreement when it submitted its first and second reports to the Data Bank.  The Hospital contends that the Appellate Court, in its own analysis of that issue, erred by considering extrinsic evidence of the parties' subjective intent in entering the Settlement Agreement in determining whether the Agreement is ambiguous.  We read the Appellate Court's opinion differently.

In setting out its task, the Appellate Court first correctly identified the governing legal principles by quoting directly from this Court's decision in *Credible Behavioral Health*.  Among other things, the Appellate Court recited that a court may consider extrinsic or parol evidence concerning the parties' subjective intent only if it determines that the contract language is ambiguous.  *Behram*, 2023 WL 4011686, at *18 (citing *Credible Behav. Health*, 466 Md. at 393-94).  The Appellate Court then reviewed the contractual language concerning the Hospital's obligation to report to the Data Bank and the code-generated language it submitted to the Data Bank, identifying the issue in dispute

24

as "whether [the Hospital] had a duty under the Settlement Agreement not to use that language in those reports." *Id.* The Appellate Court concluded that in viewing the "text, character, and purpose of the Settlement Agreement in light of the facts and circumstances surrounding its execution, . . . a reasonable person in the position of [the Hospital] could understand" its obligation to prohibit it "from filing reports with language that materially deviates from that negotiated" in the Agreement. *Id.* at *19.

After reviewing the language of the Settlement Agreement in further detail, the Appellate Court offered that "*[t]o the extent* there is any ambiguity about the meaning and scope of this reporting restriction," *id.* (emphasis added), affidavits from Dr. Behram and his attorney identified their purpose in negotiating the language at issue, *id.* The Appellate Court never concluded that the Settlement Agreement is ambiguous. Instead, that court appears to have determined that the circuit court's judgment needed to be vacated for one of two alternative reasons, without choosing between them: Either the Agreement is unambiguous and is properly interpreted as Dr. Behram interprets it, without consulting extrinsic evidence, or it is ambiguous and extrinsic evidence in the record supports Dr. Behram's interpretation. In either case, there was a material factual dispute requiring vacatur of the circuit court's decision. *Id.* As discussed below, we conclude that the Agreement is unambiguous, and so have no need to consider extrinsic evidence of the parties' subjective intent.

**B.** **_The Motions Court Erred in Entering Summary Judgment in Favor of the Hospital on Dr. Behram's Claim that the Hospital Breached the Settlement Agreement._**

We agree with the Appellate Court that the motions court erred when it awarded the Hospital summary judgment on Count One. The text of the Settlement Agreement, viewed in the context of the circumstances surrounding its execution, reflect that it was intended to resolve the parties' disputes related to the Hospital's suspensions of Dr. Behram based on the central compromise that (1) the Hospital would restore Dr. Behram's clinical privileges in full without having to provide Dr. Behram the fair hearing to which he was entitled under the bylaws, and (2) Dr. Behram would resign those clinical privileges only after the specter of adverse action by the Hospital was gone. That intent is reflected in the Settlement Agreement in multiple ways.

First, it is reflected in the recitals, which cite the suspension, Dr. Behram's entitlement to a fair hearing, the Hospital's agreement to resolve the dispute before having to provide the fair hearing, and Dr. Behram's decision to resign his clinical privileges to "practice elsewhere."

Second, the intent is reflected in the structure of the undertakings contained in the Settlement Agreement, which includes a negotiated sequence of events that required (1) the Medical Executive Committee, upon execution of the Agreement by both parties, to "convene to reinstate [Dr. Behram's] clinical privileges," (2) only after that was accomplished, Dr. Behram to resign those privileges, and (3) thereafter, the Hospital to report to the Data Bank.

26

Third, the Settlement Agreement did not merely require the Hospital to report to the Data Bank; it required the Hospital to "submit the report attached hereto as Exhibit 3," i.e., the Agreed Report Language, which states that Dr. Behram was suspended "for concerns regarding the quality of his patient care"; that the Medical Executive Committee voted "to approve his reappointment and reinstate his clinical privileges *as full and unrestricted privileges*"; and that Dr. Behram "*[t]hereafter* . . . voluntarily resigned his clinical privileges and medical staff membership at the Hospital." (Emphasis added).[17]

Considering the text of the Agreement along with the context in which the parties entered into it, we hold that a reasonable person in the position of the parties would have understood that the Hospital's obligation to report to regulatory authorities using specific, agreed upon language precluded the Hospital from also reporting contradictory and materially inconsistent language in the same report. Notably, the Hospital seems to acknowledge that it could not have added contradictory or materially inconsistent language

---

[17] In an undertaking that is not directly at issue in this appeal, but which similarly reflects the core compromise of the Agreement, the Hospital also agreed that in response to any future reference inquiries about Dr. Behram, it would provide a letter containing similar language to what was required for the Data Bank report, omitting only the basis for the suspension:

> This is to confirm that Steve Behram, M.D. had privileges at the Hospital from June 22, 2000 to September 15, 2020. His privileges were summarily suspended on September 26, 2019. The Medical Executive Committee voted on September 14, 2020 to approve his reappointment and reinstate his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital.

to the narrative portion of Section C,[18] just as it would presumably acknowledge that it could not have tacked on a final sentence to the narrative along the lines of: "Ignore those first three sentences because nothing in them is true; Dr. Behram posed imminent danger to his patients, and we never actually voted to give him back his clinical privileges." The Hospital undertook in the Settlement Agreement to "submit the report attached hereto as Exhibit 3" to the Data Bank. A reasonable person in the position of the parties would have understood that the Hospital could not satisfy its reporting obligation under the Agreement by combining the three sentences on Exhibit 3 with additional text that negated them.

The question then becomes whether a reasonable person in the position of the parties would have understood that the Hospital was precluded from accomplishing through its selection of codes that which it was precluded from accomplishing by adding text to the narrative. In that respect, it is significant that the codes entered by the Hospital are not merely alphanumeric phrases that stand alone and might easily be disregarded or overlooked. Nor did the Hospital select codes that generated random phrases that just happen to have contradicted the Agreed Report Language. Instead, the selection of those codes generated text that (1) was specifically selected by the Hospital for the message it conveyed, and (2) became the most prominent text in the relatively brief reports. The

---

[18] As discussed above, in the first report, the Hospital added a sentence to the Agreed Report Language concerning a subcommittee of the board's approval of Dr. Behram's reinstatement and resignation. After it was pointed out to the Hospital that the additional statement was not part of the Agreed Report Language, the Hospital promptly filed a new report without it.

Hospital's argument distinguishing text generated by the selection of codes from text added to the narrative relies on a distinction that the record does not support. Section 2.e. of the Agreement, combined with Exhibit 3, identifies what the Hospital agreed to report to the Data Bank, not just what the Hospital agreed to report in the narrative field of Section C. Based on the record before us, viewed in the light most favorable to the non-moving party, the code-generated text was as much a part of the reports as the narrative.[19]

Notably, although the Hospital initially claimed it had no choice but to use the alphanumeric codes it originally selected, it no longer makes that claim. Indeed, the Hospital could hardly make such a claim considering its filing of the third and fourth reports, both of which the parties treat as fully compliant with the terms of the Settlement Agreement and neither of which use the language in dispute.[20]

---

[19] The Hospital maintains that, notwithstanding the appearance and organization of the reports, the narrative portion of Section C is the most important part of the report and the code-generated text is of relatively minimal importance. Nothing in this opinion should be understood to preclude either party from introducing evidence, and making arguments based on that evidence, concerning the relative importance of portions of the Data Bank reports.

[20] The Hospital has made no claim that the absence of the disputed code-generated statements in its third and fourth filings has placed it out of compliance with its legal reporting obligations. One could hypothesize a circumstance in which the Data Bank offered only codes that were materially inconsistent with language upon which the parties had agreed and, therefore, the Hospital's legal obligation to report might be inconsistent with its contractual obligations. That circumstance is not this case. By filing the third and fourth reports to satisfy its legal reporting obligation, the Hospital has acknowledged that those obligations do not require the use of codes that are inconsistent with the report it agreed to file in Section 2.e. of the Settlement Agreement.

To be sure, the Hospital could not have simply submitted Exhibit 3 as its entire report to the Data Bank. The Hospital was presumably required to report using the form provided by the Data Bank, which required it to include, among other things, information about itself (as the reporting entity) and Dr. Behram (as the subject of the report), as well as to input codes that would generate text identifying the actions it took and the basis for the actions. The Hospital therefore had to select codes that would generate text to be included in the reports and none of those codes would have generated text that was identical to the Agreed Report Language. The question, however, is whether the circuit court was correct in determining, as a matter of law, that the Hospital was unfettered by Section 2.e. of the Settlement Agreement in its ability to select codes that were materially inconsistent with the Agreed Report Language. We conclude that the circuit court was not correct.

The Hospital's argument for summary judgment focuses on the absence of language in the Agreement stating that the Hospital could not (or had to) select particular codes in making its report to the Data Bank. That narrow focus fails to account for the plain meaning of the Hospital's affirmative obligation to submit "the report attached hereto as Exhibit 3," the structure and text of the remainder of the Agreement that defines the bargain struck by the parties, and the apparent purpose of the Agreement. *See Credible Behav. Health*, 466 Md. at 394 ("Ascertaining the parties' intentions requires us to consider the plain language of the disputed contractual provisions in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." (internal quotation marks omitted)

30

(quoting *Ocean Petroleum, Co.*, 416 Md. at 88)). Considering the Agreement as a whole and the context in which it was entered, we conclude that it is unambiguous: a reasonable person in the position of the parties would have understood that the Hospital's obligation to report to regulatory authorities using specific, agreed language precluded the Hospital from also reporting contradictory and materially inconsistent language in the same report, regardless of how that language was generated.

We now turn to the two specific code-generated statements at issue to determine whether a reasonable juror could conclude that the statements breached the Hospital's undertaking in Section 2.e. of the Settlement Agreement to "submit the report attached hereto as Exhibit 3" to the Data Bank. The first is the report of a "VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT." As discussed, the Settlement Agreement was structured to allow and require Dr. Behram to resign his clinical privileges only after the full and unqualified restoration of those privileges by the Medical Executive Committee. The report the Hospital agreed to make reflected that bargain, stating that Dr. Behram voluntarily resigned his clinical privileges only after they had been reinstated "as full and unrestricted privileges." On the record before us, a reasonable juror could conclude that the statement that Dr. Behram surrendered his clinical privileges while under or to avoid an investigation breached the Hospital's obligation to submit the report on Exhibit 3.

31

The Immediate Threat Code-Generated Statement presents a closer call. Although not directly contrary to the Agreed Report Language, a reasonable juror could still conclude that it is materially inconsistent with the Hospital's contractual undertaking because it identifies a greater severity of alleged misconduct than was reflected in the statement the parties agreed the Hospital would report. Knowing that the Hospital could have—as it eventually did—selected codes that would have populated the report with statements that were consistent with the Agreed Report Language, a reasonable juror could conclude that the Hospital's choice of the Immediate Threat Code-Generated Statement breached paragraph 2.e. of the Settlement Agreement.[21]

In sum, we agree with the Appellate Court that a reasonable juror could conclude that both of the code-generated statements at issue breached the Hospital's undertaking in Section 2.e. of the Settlement Agreement to "submit the report attached hereto as Exhibit 3" to the Data Bank.

The Hospital raises two additional arguments that we must address briefly. First, it contends that in reaching the same resolution we reach here, the Appellate Court erred in

---

[21] The Hospital's letter to Dr. Behram notifying him of his suspension identified as a basis for the action that he posed "an immediate risk of harm or an immediate or imminent risk of danger to patients." The Hospital has not argued in this Court or below that its statement in that letter to Dr. Behram from September 2019 required it to use similar language in its report to the Data Bank a year later. Indeed, such an argument would both (1) call into question the Hospital's good faith in negotiating an agreement that left such a statement out of the Agreed Report Language and (2) be inconsistent with the Hospital's third report, which has apparently been the operative report about the suspension since November 2020 and which does not reference an immediate risk of harm to patients.

failing to consider the Settlement Agreement's integration clause. The Hospital's argument is, in essence, that Dr. Behram, a sophisticated party represented by competent counsel, could have negotiated for the Hospital to use specific codes in its report to the Data Bank, chose not to do so, and is now bound by the terms of a Settlement Agreement that expressly states that it represents the entire agreement between the parties. The Hospital's argument is misplaced.

"Maryland law generally recognizes the validity and effect of integration clauses." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 126 (2011). When a contract contains an integration or merger clause, the agreement purports to be the final, controlling agreement between the parties, such that it "supersedes all informal understandings and oral agreements relating to the subject matter of the contract," *Integration Clause*, *Black's Law Dictionary* 963 (11th ed. 2019), and typically renders evidence of such prior understandings and agreements inadmissible, *Foreman v. Melrod*, 257 Md. 435, 441 (1970). "[A]lthough not absolutely conclusive," such a clause "is indicative of the intention of the parties to finalize their complete understanding in the written contract." *Pumphrey v. Kehoe*, 261 Md. 496, 505 (1971). As a result, "[a]ll prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the extent of their obligations[,]" and, "in the absence of fraud, duress, or mistake . . . parol evidence of conversations or alleged oral agreements made before or at the time of the integration of the contract into the writing must be excluded from evidence[.]" *Foreman*, 257 Md. at 441.

33

Here, the Appellate Court's reasoning, like ours, was not dependent on the identification of any agreement or informal understanding between the parties that preceded or that is separate from the Settlement Agreement. Our reasoning is premised on the plain language of the Settlement Agreement itself, considered "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." *Credible Behav. Health*, 466 Md. at 394 (internal quotations omitted) (quoting *Ocean Petroleum, Co.*, 416 Md. at 88). The Settlement Agreement's integration clause is not implicated.

Second, the Hospital argues that the Appellate Court erred by applying the implied duty of good faith and fair dealing to impose a substantive duty on the Hospital that the parties did not include in their agreement. On that point, we are more sympathetic to the Hospital's argument, although for a different reason. It appears that the implied duty of good faith and fair dealing was not raised in or ruled on by the circuit court. Ordinarily, an appellate court will not address an issue that was not raised in or decided by the trial court. Md. Rule 8-131(a). Here, we find it unnecessary to consider the implied duty of good faith and fair dealing to resolve the dispute before us.

In sum, we agree with the Appellate Court that the circuit court erred in awarding summary judgment to the Hospital on Count One of Dr. Behram's third amended complaint. We will affirm the Appellate Court's vacatur of the award of summary judgment on Count One and remand for further proceedings.

34

## IV.    COUNT FOUR:  BREACH OF THE BYLAWS

In his cross-petition, Dr. Behram contends that the Appellate Court erred in upholding the circuit court's entry of summary judgment in favor of the Hospital on Count Four of his third amended complaint, in which he alleges a breach of the Hospital's bylaws by failing to afford him a timely fair hearing after his second suspension.[22]  We again agree with the Appellate Court.

The Settlement Agreement, which prominently discusses Dr. Behram's right to a fair hearing in its opening recitals, contained a broad release by Dr. Behram of any claim "from the beginning of time up to and including the date on which the Hospital signs this Agreement that relates to . . . the Hospital's suspension of the Physician's privileges on September 26, 2019."  Dr. Behram's contention that the Hospital failed to provide him a timely fair hearing to contest the September 26, 2019 suspension of his clinical privileges unquestionably "relates to" that suspension.  The circuit court correctly determined that Dr. Behram released the claim at issue in Count Four.

Dr. Behram finds support for his position in the fact that his release in the Settlement Agreement also applied to the "Hospital's July 17, 2019 suspension and subsequent reinstatement of the Physician's privileges on August 13, 2019," but did not separately

---

[22] The circuit court granted the Hospital's concurrent motions to dismiss and for summary judgment on the bylaws claim, and the Appellate Court discussed and affirmed only the grant of summary judgment.  *Behram*, 2023 WL 4011686, at *24.  Both courts reasoned that the broad language of release in the Agreement covered any potential breach of the bylaws.  *Id.*

apply to the *reinstatement* of his privileges following the second suspension. We find no merit in that contention. Regardless of whether Dr. Behram's entitlement to a timely fair hearing could plausibly be considered "related to" any possible prospective reinstatement—or, as Dr. Behram argued, to a delay in such reinstatement—it certainly "related to" the suspension from which it arose. It was, therefore, released in the Settlement Agreement.

## CONCLUSION

For these reasons, we hold:

1. The Appellate Court correctly held that the circuit court erred in awarding summary judgment to the Hospital on Count One of Dr. Behram's third amended complaint because a reasonable juror could conclude that the Hospital breached the Settlement Agreement by submitting a report to the Data Bank containing language that contradicted and was materially inconsistent with the report it agreed to submit.

2. The Appellate Court did not err in affirming the circuit court's entry of summary judgment in favor of the Hospital on Count Four of Dr. Behram's third amended complaint because he released that claim.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.**

Justice Gould joins in judgment only.

36

**APPENDIX**


**DCN:** 5500000165725358
Process Date: 09/17/2020
Page: 1 of 3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

# BEHRAM, STEVE S

## *SHADY GROVE MEDICAL CENTER*

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 09/26/2019 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES<br>- VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT | - IMMEDIATE THREAT TO HEALTH OR SAFETY<br>- SUBSTANDARD OR INADEQUATE CARE |

### A. REPORTING ENTITY

| | |
|---|---|
| Entity Name: | SHADY GROVE MEDICAL CENTER |
| Address: | 9901 MEDICAL CENTER DR |
| City, State, Zip: | ROCKVILLE, MD 20850-3357 |
| Country: | |
| Name or Office: | SHELIA MYERS |
| Title or Department: | DIRECTOR, MEDICAL STAFF SERVICES |
| Telephone: | (240) 826-6116 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

### B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)

| | |
|---|---|
| Subject Name: | BEHRAM, STEVE S |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | ███████ |
| Organization Name: | CONGRESSIONAL OB GYN |
| Work Address: | 15005 SHADY GROVE RD STE 130 |
| City, State, ZIP: | ROCKVILLE, MD 20850-6341 |
| Home Address: | ███████ |
| City, State, ZIP: | ███████ |
| Deceased: | NO |
| Social Security Numbers (SSN): | ███████ |
| National Provider Identifiers (NPI): | ███████ |
| Professional School(s) & Year(s) of Graduation: | EASTERN VIRGINIA MEDICAL SCHOOL (1994) |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | ███████ |
| Specialty: | OBSTETRICS & GYNECOLOGY |
| Drug Enforcement Administration (DEA) Numbers: | ███████ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | SHADY GROVE MEDICAL CENTER |
| Business Address of Affiliate: | 9901 MEDICAL CENTER DR |
| City, State, ZIP: | ROCKVILLE, MD 20850-3357 |
| Nature of Relationship(s): | OTHER RELATIONSHIP - NOT CLASSIFIED, SPECIFY (999) |
| Other, as Specified: | HOSPITAL AFFILIATION |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**226**

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov



**DCN:** 5500000165725358
Process Date: 09/17/2020
Page: 2    of    3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

| C. INFORMATION REPORTED | | |
|---|---|---|
| | Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| | Basis for Action: | IMMEDIATE THREAT TO HEALTH OR SAFETY (F1) |
| | | SUBSTANDARD OR INADEQUATE CARE (F6) |
| | Adverse Action Classification Code(s): | SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES (1632) |
| | | VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) |
| | Date Action Was Taken: | 09/26/2019 |
| | Date Action Became Effective: | 09/26/2019 |
| | Length of Action: | PERMANENT |
| | Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reinstatement of his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital. The Professional Affairs Sub-Committee of the Board approved the reinstatement and resignation on September 30, 2020 with a retroactive date of September 16, 2020. |

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:        09/17/2020
Date of Most Recent Change:       09/17/2020

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

# 227



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000165725358
Process Date: 09/17/2020
Page: 3   of   3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

| F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK | The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report. |
|---|---|

Subject Name(s): BEHRAM, STEVEN
Occupation/Field of Licensure: Physician (MD)
State License Number, State of Licensure: ▮▮▮▮▮▮

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**———— END OF REPORT ————**

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**NATIONAL PRACTITIONER DATA BANK**



# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000168401903
Process Date: 11/17/2020
Page: 1    of    3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

# BEHRAM, STEVE S

## *SHADY GROVE MEDICAL CENTER*

| TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 09/26/2019 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - SUSPENSION OF CLINICAL PRIVILEGES | - SUBSTANDARD OR INADEQUATE CARE |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | SHADY GROVE MEDICAL CENTER |
| Address: | 9901 MEDICAL CENTER DR |
| City, State, Zip: | ROCKVILLE, MD 20850-3357 |
| Country: | |
| Name or Office: | SHELIA MYERS |
| Title or Department: | DIRECTOR, MEDICAL STAFF SERVICES |
| Telephone: | (240) 826-6116 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | BEHRAM, STEVE S |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | ▓▓▓▓▓ |
| Organization Name: | CONGRESSIONAL OB GYN |
| Work Address: | 15005 SHADY GROVE RD STE 130 |
| City, State, ZIP: | ROCKVILLE, MD 20850-6341 |
| Home Address: | ▓▓▓▓▓ |
| City, State, ZIP: | ▓▓▓▓▓ |
| Deceased: | NO |
| Social Security Numbers (SSN): | ▓▓▓▓▓ |
| National Provider Identifiers (NPI): | ▓▓▓▓▓ |
| Professional School(s) & Year(s) of Graduation: | EASTERN VIRGINIA MEDICAL SCHOOL (1994) |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | ▓▓▓▓▓ |
| Specialty: | OBSTETRICS & GYNECOLOGY |
| Drug Enforcement Administration (DEA) Numbers: | ▓▓▓▓▓ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | SHADY GROVE MEDICAL CENTER |
| Business Address of Affiliate: | 9901 MEDICAL CENTER DR |
| City, State, ZIP: | ROCKVILLE, MD 20850-3357 |
| Nature of Relationship(s): | OTHER RELATIONSHIP - NOT CLASSIFIED, SPECIFY (999) |
| Other, as Specified: | HOSPITAL AFFILIATION |

**C. INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| Basis for Action: | SUBSTANDARD OR INADEQUATE CARE (F6) |
| Adverse Action Classification Code(s): | SUSPENSION OF CLINICAL PRIVILEGES (1630) |
| Date Action Was Taken: | 09/26/2019 |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



DCN: 5500000168401903
Process Date: 11/17/2020
Page: 2 of 3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

| | |
|---|---|
| Date Action Became Effective: | 09/26/2019 |
| Length of Action: | INDEFINITE |

Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reappointment and reinstate his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntary resigned his clinical privileges and medical staff membership at the Hospital.

## D. SUBJECT STATEMENT

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

## E. REPORT STATUS

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

| | |
|---|---|
| Date of Original Submission: | 11/17/2020 |
| Date of Most Recent Change: | 11/17/2020 |

## F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

| | |
|---|---|
| Subject Name(s): | BEHRAM, STEVEN |
| Occupation/Field of Licensure: | Physician (MD) |
| State License Number, State of Licensure: | ██████████ |

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

243



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000168401903
Process Date: 11/17/2020
Page: 3    of    3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

**END OF REPORT**

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

244

**NATIONAL PRACTITIONER DATA BANK**



# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000168441092
Process Date: 11/18/2020
Page: 1  of  3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

## BEHRAM, STEVE S

### *SHADY GROVE MEDICAL CENTER*

| REVISION TO TITLE IV CLINICAL PRIVILEGES ACTION | Date of Action: 09/16/2020 |
|---|---|
| **Subsequent Action** | **Basis for Initial Action** |
| - CLINICAL PRIVILEGES RESTORED OR REINSTATED, COMPLETE | - SUBSTANDARD OR INADEQUATE CARE |

| A. REPORTING ENTITY | |
|---|---|
| Entity Name: | SHADY GROVE MEDICAL CENTER |
| Address: | 9901 MEDICAL CENTER DR |
| City, State, Zip: | ROCKVILLE, MD 20850-3357 |
| Country: | |
| Name or Office: | SHELIA MYERS |
| Title or Department: | DIRECTOR, MEDICAL STAFF SERVICES |
| Telephone: | (240) 826-6116 |
| Entity Internal Report Reference: | 5500000168401903 |
| Type of Report: | REVISION |
| Related Report Number: | 5500000168401903 |

| B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL) | |
|---|---|
| Subject Name: | BEHRAM, STEVE S |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | ███████ |
| Organization Name: | CONGRESSIONAL OB GYN |
| Work Address: | 15005 SHADY GROVE RD STE 130 |
| City, State, ZIP: | ROCKVILLE, MD 20850-6341 |
| Home Address: | ███████ |
| City, State, ZIP: | ███████ |
| Deceased: | NO |
| Social Security Numbers (SSN): | ███████ |
| National Provider Identifiers (NPI): | ███████ |
| Professional School(s) & Year(s) of Graduation: | EASTERN VIRGINIA MEDICAL SCHOOL (1994) |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | ███████ |
| Specialty: | OBSTETRICS & GYNECOLOGY |
| Drug Enforcement Administration (DEA) Numbers: | ███████ |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action): | SHADY GROVE MEDICAL CENTER |
| Business Address of Affiliate: | 9901 MEDICAL CENTER DR |
| City, State, ZIP: | ROCKVILLE, MD 20850-3357 |
| Nature of Relationship(s): | OTHER RELATIONSHIP - NOT CLASSIFIED, SPECIFY (999) |
| Other, as Specified: | HOSPITAL AFFILIATION |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

245



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000168441092
Process Date: 11/18/2020
Page: 2    of    3
BEHRAM, STEVE S
For authorized use by:
BEHRAM, STEVE S

| **C. INFORMATION REPORTED** | | |
|---|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES | |
| Adverse Action Classification Code(s): | CLINICAL PRIVILEGES RESTORED OR REINSTATED, COMPLETE (1680) | |
| Date Action Was Taken: | 09/14/2020 | |
| Date Action Became Effective: | 09/16/2020 | |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Dr. Steve Behram's clinical privileges were summarily suspended on September 26, 2019 for concerns regarding the quality of his patient care. The Medical Executive Committee voted on September 14, 2020 to approve his reappointment and reinstate his clinical privileges as full and unrestricted privileges. Thereafter, Dr. Behram voluntarily resigned his clinical privileges and medical staff membership at the Hospital. | |

| **D. SUBJECT STATEMENT** | |
|---|---|
| If the subject identified in Section B of this report has submitted a statement, it appears in this section. | |

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:     11/18/2020
Date of Most Recent Change:     11/18/2020

**F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK**

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

Subject Name(s):     BEHRAM, STEVEN
Occupation/Field of Licensure:     Physician (MD)
State License Number, State of Licensure:     █████████

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

| DCN: 5500000168441092 |
|---|
| Process Date: 11/18/2020 |
| Page: 3 of 3 |
| BEHRAM, STEVE S |
| For authorized use by: |
| BEHRAM, STEVE S |

**This report is maintained under the provisions of:** Title IV

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**━━━ END OF REPORT ━━━**

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**